Dana M. Florkowski, DC Bar No. 1659708, VA Bar No. 93499
Florkowski.Dana.M@dol.gov
Alyssa C. George, DC Bar No. 187659
George.Alyssa.C@dol.gov
Trial Attorneys
Office of the Solicitor
Plan Benefits Security Division
U.S. Department of Labor
P.O. Box 1914
Washington, DC 20013
Tel: (202) 693-5600
Fax: (202) 693-5610

Attorneys for Plaintiff Julie A. Su,
Acting Secretary of the United States Department of Labor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JULIE A. SU, Acting Secretary, United States Department of Labor, <br><br> Plaintiff, <br><br> v. <br><br> ALERUS FINANCIAL, N.A., JAMES A. KISSLER, NORCO, INC., and NORCO, INC. EMPLOYEE STOCK OWNERSHIP PLAN, <br><br> Defendants. | Case No.: <u>1:23-cv-00537</u> <br><br> **COMPLAINT FOR ERISA VIOLATIONS** |

Plaintiff Julie A. Su, Acting Secretary of the United States Department of Labor (the

"Secretary"), alleges as follows:

## PRELIMINARY STATEMENT

1.      In 2015, James Kissler ("Kissler") decided to sell shares he controlled in his company, Norco, Inc. ("Norco" or "Company"), a privately held North Dakota-based supplier of industrial and medical supplies, equipment, and specialty gases, to the Norco, Inc. Employee Stock Ownership Plan and Trust ("ESOP" or "Plan"), a newly created retirement plan established for the benefit of Norco's employees.

2.      In November 2015, Kissler hired Alerus Financial, N.A. ("Alerus") to act as the Plan's trustee and independent fiduciary for the transaction. The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.,* requires such fiduciaries to act prudently and with undivided loyalty to the plan, and to pay no more than fair market value for the stock.

3.      Just a month later, in December 2015, Alerus authorized the Plan to pay Kissler and a related family foundation (collectively the "Sellers") more than $140 million for 35% of Norco's stock (the "ESOP Transaction"), without conducting a good faith investigation of the stock's fair market value. In particular, Alerus rushed its due diligence in order to close the transaction on the Sellers' preferred timetable, and in the process relied on a valuation report rife with manifest flaws that substantially overvalued the stock. Indeed, that report valued Norco at an amount nearly 250% greater than the value reached by a reputable valuation firm retained by Norco roughly three and a half years earlier.

4.      As a result of its actions and omissions, Alerus caused the Plan to overpay by tens of millions of dollars, breached its duties of prudence and loyalty, and engaged in a transaction prohibited by ERISA.

5.     As CEO and Chairman of Norco's Board of Directors at the time of the ESOP Transaction, Kissler was closely involved in all aspects of the Company and the ESOP Transaction, and he knew Alerus's negotiation and investigation of the fair market value of the ESOP's shares was flawed. In allowing Alerus—which Kissler appointed as trustee and was required to monitor—to enter into this transaction, and otherwise failing to monitor Alerus, Kissler violated his own fiduciary duties of prudence, loyalty, and adherence to plan documents, and knowingly participated in Alerus's ERISA violations.

## JURISDICTION AND VENUE

6.     This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA sections 409 and 502(a)(2) and (a)(5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (a)(5), to redress violations and enforce the provisions of Title I of ERISA.

7.     This Court has jurisdiction over this action pursuant to ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.     Venue with respect to this action lies in the United States District Court for the District of Idaho, pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ESOP is administered in Boise, Idaho, within this district.

## PARTIES

9.     The Secretary is authorized to enforce Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries and other parties who violate ERISA and other parties who knowingly participate in those violations. 29 U.S.C. § 1132(a)(2), (5).

10.     Alerus is a subsidiary of Alerus Financial Corporation, both of which are headquartered in Grand Forks, North Dakota. Alerus is a national service provider to retirement plans and regularly provides independent trustee and fiduciary services in connection with

employee stock ownership plans, including acting as the independent trustee of such plans. At all relevant times, Alerus was an independent trustee of the ESOP and a fiduciary to the ESOP under 29 U.S.C. § 1002(21)(A)(i) and (iii).

11.    At all relevant times, Kissler was Norco's CEO and Chairman of Norco's Board of Directors. Kissler appointed Alerus to serve as an independent trustee for the ESOP and had the authority to remove Alerus as the ESOP Trustee. At all relevant times, Kissler was a fiduciary to the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) and (iii). Kissler was also a party in interest to the ESOP because he (1) was a fiduciary to the ESOP, (2) was CEO and Chairman of Norco's Board of Directors at the time of the ESOP Transaction, and (3) owned 39.9% of the outstanding Norco shares at the time of the ESOP Transaction. *See* 29 U.S.C. § 1002(14)(A), (H).

12.    The ESOP is an employee benefit plan as defined by 29 U.S.C. § 1002(3) and subject to coverage under ERISA pursuant to 29 U.S.C. § 1003(a)(1). The ESOP also includes the Norco, Inc. Employee Stock Ownership Trust, which holds the ESOP's assets. The ESOP is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

13.    At all relevant times, Norco was the Plan sponsor as defined in ERISA section 3(16)(B)(i), 29 U.S.C. § 1002(16)(B)(i). As the employer whose employees are covered by the Plan, Norco was a party in interest pursuant to ERISA section 3(14)(C), 29 U.S.C. § 1002(14)(C). Norco is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

## FACTUAL BACKGROUND

14.     Incorporated in Boise, Idaho in 1967, Norco is a regional distributor of industrial equipment and supplies, medical equipment, and industrial chemicals and gases. Kissler purchased Norco from his father, Larry Kissler, in 1985.

15.     In 2015, the year of the ESOP Transaction, Norco had approximately 1,200 employees and operated approximately 65 retail and wholesale locations in Idaho, Oregon, Washington, Montana, Nevada, Utah, and Wyoming.

16.     Norco is governed by a Board of Directors. At the time of the ESOP Transaction, Kissler served as Chairman of Norco's Board. The other Board members at that time included his daughter, Nicole Kissler, as well as Randy Hales, Cheryl Larabee, Greg Vasek, and Larry Aarsby. Kissler also served as Norco's CEO at the time of the ESOP Transaction. Ned Pontious served as Norco's President and Mike Sabin served as Norco's Chief Financial Officer.

### Norco's Stock is Valued at $138.4 Million Less than Four Years Before the ESOP Transaction

17.     Prior to the ESOP Transaction, the most recent Norco stock transaction occurred in November 2012, when Kissler transferred 3,900 shares of non-voting Norco common stock to the McKenzie GT Trust.

18.     In order to determine the value of this stock, Norco hired a valuation advisor, Willamette Management Associates ("Willamette"), to provide a fair market valuation for Norco's stock. Willamette's valuation concluded that the fair market value of 100% of Norco's equity on a nonmarketable, noncontrolling basis, as of February 29, 2012, was $138.4 million.

### Kissler Hires Ambrose to Quarterback the ESOP Transaction

19.     In or around 2015, Kissler decided to inquire into establishing an ESOP to which he could sell some of the Norco shares that he controlled.

20.     In August 2015, Kissler selected Ambrose Capital Partners, LLC ("Ambrose") to serve as a financial advisor to Norco in a potential sale of Norco stock to the ESOP. Ambrose's responsibilities for the initial phase of the engagement ("Phase 1") included modeling and structuring a potential ESOP transaction, analyzing historical and forecasted cash flows, preparing a preliminary valuation of the Company for purposes of the ESOP Transaction, and preparing a presentation summarizing its analyses.

21.     Ambrose gave a presentation to Norco and Kissler in November 2015 in which it summarized Norco's objectives in the ESOP Transaction as, among other things, creating a "liquidity event" for the Sellers and exploring "all available tax benefits from the [ESOP] transaction, including the ability of the Selling Shareholders to defer capital gains taxes under IRC Section 1042."

22.     In its November 2015 presentation to Norco and Kissler, Ambrose valued a 35% preferred equity stake in Norco (including the value of preferred dividends) at $139.1 million.

23.     In its November 2015 presentation to Norco and Kissler, Ambrose described the anticipated ESOP Transaction as closing "on or before December 31, 2015."

24.     Following that presentation, Kissler engaged Ambrose for a second "Transaction Implementation" phase ("Phase 2") for the anticipated transaction. Ambrose's responsibilities for the Phase 2 engagement included managing the due diligence process, identifying other advisors for the ESOP Transaction, and negotiating the transaction terms with the ESOP Trustee.

**Ambrose Contacts Alerus About Serving as the ESOP Trustee**

25.     In October 2015, Ambrose contacted Alerus about serving as the ESOP's transactional trustee to represent the ESOP in deciding whether and on what terms to purchase Norco stock from Kissler.

26.     Ambrose informed Alerus that the estimated size of the transaction was between $100 million and $120 million, and that the anticipated closing date of the transaction was December 31, 2015. Alerus recorded both facts in an internally prepared engagement summary dated October 22, 2015.

27.     Though not yet formally engaged, Alerus quickly moved to line up its advisors for the anticipated ESOP Transaction: Chartwell Financial Advisory, Inc. ("Chartwell") as its valuation advisor, and McDermott, Will, & Emery ("MWE") as its legal advisor.

28.     On October 23, 2015, Nels Carlson of Alerus emailed Chartwell's Steve Nelson and MWE's Allison Wilkerson to say that he had just spoken with Mike Harden of Ambrose who "indicated that Norco was comfortable moving forward with Alerus and our selected, independent advisors in connection with the potential ESOP transaction."

29.     On October 26, 2015, Ambrose informed Alerus that MWE's fees for the potential transaction were not to exceed $80,000 and that Chartwell's fees were not to exceed $85,000.

30.     On November 2, 2015, Chartwell agreed to serve as Alerus's financial advisor on the prospective ESOP Transaction, and MWE agreed to serve as its legal advisor. Both engagement agreements—which were not formally executed until early December—included the fee caps imposed by Ambrose.

31.     On November 9, 2015, Alerus, Chartwell, and MWE met with Ambrose and Norco regarding the proposed transaction. During the meeting, Ambrose increased its representation of the value of the ESOP's 35% interest to $160.7 million.

32.     At this point Alerus itself still had not formally agreed to serve as the ESOP's trustee. Before it could sign an engagement agreement, the leadership of Alerus's Retirement Services division had to first approve of the potential engagement.

33.     To that end, on November 10, 2015, Mike Flesch, Alerus's Director of Fiduciary Services, emailed John Flesch, Alerus's Executive Vice President, seeking such approval, and noting that Alerus has "completed several transactions structured by Michael Harden [of Ambrose] in recent years." The email attached an updated engagement summary, reflecting Ambrose's increased representation of the value of the ESOP's shares, listing the expected transaction amount as between $135 million and $160 million. The updated engagement summary continued to list an anticipated closing date of December 31, 2015.

34.     That same day (November 10, 2015), John Flesch approved Alerus's participation as trustee of the Norco ESOP. As of November 10, 2015, when Alerus agreed to serve as ESOP trustee for purposes of the ESOP Transaction, it also understood that it would become the ongoing trustee of the Norco ESOP if the transaction were to close.

**Kissler Formally Appoints Alerus as Trustee**

35.     On November 24, 2015, Kissler, as Norco's CEO, and Alerus executed an agreement for Alerus to serve as the transactional ESOP Trustee for the proposed purchase of Norco stock by the ESOP.

36.     Pursuant to the Trustee Engagement Agreement, as the ESOP Trustee, Alerus was responsible for:

> Reviewing, analyzing, and making a determination as to whether the ESOP should approve, consent to, and/or otherwise engage in certain proposed transactions that may include: (i) a purchase of common stock by the ESOP; (ii) a redemption of common stock by the Company; (iii) the implementation of certain performance incentive and/or compensation arrangements for key management employees of the Company; and such other transactions and/or stock disposition which, separately or in

combination may result in the ESOP owning a minority interest in the Company's common stock.

37.     Alerus acknowledged that it was a "fiduciary," that it would continue to serve as a fiduciary "until such time as it resigns, is removed, or upon the completion or cancellation of the proposed engagement," and that in performing these services, it would "act independently to perform all actions and execute all documents necessary or required to negotiate transaction terms and conditions that are in the 'best interests of Plan participants' and consistent with the requirements of the plan document and applicable law."

**Alerus Prepares Offer on the Same Day it Receives Chartwell's Draft Valuation Report**

38.     On November 25, 2015, Ambrose, on behalf of the Sellers, conveyed an opening offer to Alerus of $160.7 million for a 35% equity interest in Norco.

39.     On December 3, 2015, Chartwell sent Alerus a 62-page draft report valuing a 35% equity interest in Norco at between $129.9 to $150.9 million ("Draft Valuation Report").

40.     That very same day, Alerus met with Chartwell and MWE to discuss Chartwell's Draft Valuation Report and Ambrose's offer.

41.     Also on that same day (December 3, 2015), after meeting with its advisors, Alerus instructed MWE to prepare a $135 million counteroffer on behalf of the ESOP—a starting position more than $5 million higher than the bottom end of Chartwell's preliminary range, but precisely aligning with the bottom end of the revised estimate Alerus had prepared in early November based on information from Ambrose.

42.     MWE conveyed Alerus's $135 million counteroffer to Ambrose on December 8, 2015.

43.     After exchanging additional offers during the ensuing week, Alerus agreed to accept Ambrose's $145 million offer. On December 18, after certain adjustments, the purchase price was set at $141.58 million.

### Chartwell Drafts its Fairness Opinion Without Reviewing Some Referenced Documents and Provides its Draft Fairness Opinion to Ambrose Before Issuing its Final Opinion

44.     Chartwell provided a draft Fairness Opinion to Alerus on the evening of December 21, 2015. When it transmitted the draft opinion, Chartwell informed Alerus that it had not yet seen some of the documents referenced in the document as "Information Considered" in reaching its opinion.

45.     Before issuing its final fairness opinion to Alerus, Chartwell provided its draft opinion to Ambrose, the advisor to the Sellers. Ambrose provided redline edits and comments on its contents and conclusions, and Chartwell incorporated several of Ambrose's edits into the final version of its fairness opinion. Alerus knew both that Chartwell provided its draft fairness opinion to Ambrose and that Ambrose provided edits to the opinion.

46.     Chartwell issued Alerus a final Fairness Opinion dated December 23, 2015, in which Chartwell opined that "the consideration to be paid by the Trust for the ESOP Shares . . . is not greater than the fair market value" of those shares, and "the terms of the overall Transaction are fair to the Trust from a financial point of view."

### Chartwell's Final Valuation Report Contains Numerous Red Flags

47.     On December 23, 2015, Chartwell issued to Alerus a final opinion of the fair market value of Norco's stock ("Final Valuation Report"). Chartwell used one income-based approach—the discounted cash flow ("DCF") method—and two market-based approaches—the guideline public company method and the merger and acquisition method—to calculate its range

of fair market value. The Final Valuation Report provided a fair market value range for a 35%

interest in Norco of $125.95 to $146.95 million.

<u>Red Flag #1: Unreasonably High Long-term Growth Rate</u>

48.    The DCF method values a company by projecting its future free cash flows and

converting them to their present value equivalent using a discount rate. It consists of two

components: (1) a projection of the company's near-term cash flows (often referred to as the

"discrete period") and (2) a projection of long-term cash flows following the discrete period (the

latter projection is referred to as the "terminal value"). Because long-term growth is generally

harder to predict than near-term growth, the growth-rate assumptions used or implied by the

terminal value calculation should generally be more conservative than those use for the discrete

period.

49.    For its discrete period projections, Chartwell assumed that Norco's net sales

would achieve a compound annual growth rate of 5.2% for the five years following the

transaction.

50.    Yet Chartwell's terminal value calculation implied a long-term growth rate for

Norco into perpetuity of *6.8%.* This rate not only exceeded Chartwell's near-term growth

assumptions for Norco, it also exceeded other standard reasonableness checks such as anticipated

GDP growth in the entire U.S. economy for 2016. The Final Valuation Report did not explain

why its long-term growth assumption for Norco exceeded its near-term growth assumption for

Norco and anticipated GDP growth.

<u>Red Flag #2: Unreasonable Capital Structure Assumption</u>

51.    To determine the discount rate it would apply to convert Norco's future cash

flows to a present value in its DCF analysis, Chartwell calculated Norco's weighted average cost

of capital ("WACC"). A WACC calculation involves determining (a) the rate of return an equity

11

investor in the company would demand taking into account the company's risk profile ("cost of equity"), (b) the interest rate a bank would demand for issuing debt to the company ("cost of debt"), and then (c) ascribing a "weighting" to the cost of equity and cost of debt based on the company's capital structure. All things equal, the lower the discount rate (or WACC), the higher the DCF valuation.

52.     The Final Valuation Report determined that Norco's cost of debt was 3.6%, compared to its cost of equity of 17.7%. As a result, the more weighting Chartwell ascribed to Norco's cost of debt, the lower the resulting WACC that would be used to discount future cash flows, and the higher the resulting DCF valuation.

53.     In its Final Valuation Report, Chartwell assigned a *45%* weighting to Norco's cost of debt even though (1) over the preceding four years, debt made up an average of only 24.5% of Norco's capital structure, and (2) Chartwell determined that, for the Norco "peer group" companies Chartwell selected for its guideline public company method, both their median and mean capital structures over the preceding five years never exceeded 20% debt. The Final Valuation Report nowhere explains the basis for choosing a 45% debt weighting for Norco when neither Norco's own history nor peer group data supported such a high weighting.

<u>Red Flag #3: Failure to Adjust Norco's Debt to Account for New Plant Project</u>

54.     In the Final Valuation Report's DCF analysis, Chartwell removed approximately $21 million in capital expenditures that Norco had projected in connection with building a new air separation plant, supposedly because Norco was planning on financing that portion of the plant with bank debt. If that were true, Chartwell would have needed to *add* a corresponding amount to Norco's debt in its valuation, which would have reduced its resulting valuation. The Final Valuation Report failed to do so.

Red Flag #4: Reliance on Incomparable Guideline Companies

55.     The guideline public company method values a company by identifying valuation multiples derived from publicly traded guideline companies and then applying those multiples to the subject company's financials. Chartwell acknowledged extreme disparities in size and geographic reach between Norco and the guideline companies it used for this method; for example, the median net sales of the guideline companies was more than thirty times higher than Norco's. But Chartwell failed to appropriately discount its selected guideline company multiples to account for these significant differences before using those multiples to determine Norco's enterprise value.

Red Flag #5: Failure to Account for Disparity with Willamette Valuation

56.     The Willamette Valuation had concluded that the fair market value of 100% of Norco's equity on a nonmarketable, noncontrolling basis on February 29, 2012, was $138.4 million. Yet in its Final Valuation Report issued on December 23, 2015, Chartwell valued 100% of Norco's equity on the same nonmarketable, noncontrolling basis at a range of $319 to $379 million. The midpoint of Chartwell's equity value—$349 million—was 250% greater than Willamette's valuation a few years earlier.

57.     In contrast, between 2011 (which was the year before Willamette's February 2012 valuation) and the time of Chartwell's Final Valuation Report in December 2015, Norco's revenues increased by only 29%, from $220 million to $285 million.

58.     Chartwell's Final Valuation Report did not explain the disparity between its valuation and the one Willamette derived a few years earlier.

Red Flag #6: Reliance on Unaudited Financial Statements Not Prepared on a GAAP Basis

59.     Alerus knew the Chartwell Valuation Report was based on unaudited financial statements that were not prepared according to Generally Accepted Accounting Principles (GAAP). This deviated from Alerus' typical practice for the employee stock ownership plan transactions it works on.

Red Flag #7: Last-Minute Disclosure of Financial Information

60.     Alerus was aware of additional information regarding Norco's finances that Chartwell could not have incorporated into its valuation, given the timing of the disclosures. For example, on December 22, the evening before the ESOP Transaction closed, Norco's representatives disclosed approximately $6 million in bonus depreciation that had not been reflected in the financial statements or forecast that were previously provided, as well as news that Norco planned to pay its then-President a severance package totaling $1.5 million starting in 2017 or 2018.

61.     As a result of these and other flaws, the Chartwell Valuation Report reached an inflated conclusion of Norco's value and overstated the fair market value of the ESOP's shares by tens of millions of dollars.

**Alerus Signs Off on ESOP Transaction Just Six Weeks After Agreeing to Serve as Trustee**

62.     On December 23, 2015, Alerus, acting as ESOP Trustee, entered into a Stock Purchase Agreement with the Sellers in which it approved the ESOP's purchase of 3,500,000 convertible preferred shares of Norco from the Sellers for $141.58 million, subject to certain post-closing adjustments. The ESOP secured this purchase with an internal loan between the ESOP and Norco, with Alerus signing on the ESOP's behalf.

## The ESOP Is Formally Created

63.     The ESOP was established with an effective date of January 1, 2015. Under the document governing the Plan, the Plan Administrator of the ESOP was the "ESOP Committee," which was to be appointed by the Company. In the absence of such a committee, Norco's Board of Directors assumed the powers, duties and responsibilities of the ESOP Committee. At the time of the ESOP Transaction, Norco had not yet appointed an ESOP Committee. Accordingly, Norco's Board of Directors, led by Kissler, had the "powers, duties, and responsibilities" of administering the ESOP. The Plan Document also provided that the "Company shall have the sole authority to appoint and remove the Trustee."

64.     The Plan Document further provided that no "asset of the Trust" may be "used for, or diverted to, purposes other than the exclusive benefit of the Participants or their Beneficiaries."

65.     The Trust Agreement between Norco and Alerus provided that "[a]ll purchases or exchanges of Employer Securities shall be for no more than 'adequate consideration,' as defined in Section 3(18) of ERISA."

66.     In 2016, pursuant to the Stock Purchase Agreement, the purchase price and internal loan amount were adjusted to $143,214,162.

## Kissler Was a Fiduciary to the ESOP and Knew the ESOP Overpaid Amidst a Compromised Valuation Process

67.     At the time of the ESOP Transaction, Kissler was a fiduciary to the ESOP because he appointed Alerus and retained a duty to monitor Alerus.

68.     Kissler knew the purchase price approved by Alerus caused the ESOP to overpay for its Norco shares.

69.     At the time of the ESOP Transaction, Kissler was Norco's longtime CEO and Chairman of its Board of Directors, as well as Norco's largest shareholder, and was closely familiar with all aspects of Norco's operations and financial status.

70.     For example, Kissler, along with Sabin, developed Norco's financial projections, including the projections that formed the basis for the Chartwell Valuation Report, and Kissler gave final approval to the projections.

71.     Kissler knew that Willamette valued 100% of Norco's equity on a nonmarketable, noncontrolling basis as of February 29, 2012, at $138.4 million. In fact, Kissler had similarly provided the financial and company information Willamette used to prepare that valuation. And Kissler thereafter relied upon the Willamette Valuation's conclusion of fair market value when he transferred some of his shares to the McKenzie GT Trust. Kissler thus knew that the purchase price for the ESOP Transaction represented a drastic increase in value compared to the Willamette Valuation that Norco's performance between 2012 and 2015 did not justify.

72.     Kissler was closely involved in formulating and carrying out the ESOP Transaction. For example, Kissler selected and engaged the parties who would negotiate both sides of the deal: Ambrose for the Sellers, and Alerus for the ESOP.

73.     Kissler also actively participated in a November 9, 2015, meeting during which he, other Norco management, and Ambrose presented a summary of the proposed transaction and Company financial information to Alerus and Chartwell.

74.     Kissler's chosen representative, Ambrose, dictated the structure, financing, and timeline of the transaction; provided valuation estimates to Alerus and its advisors; and represented the Sellers in negotiations with Alerus.

75.     Kissler and his representatives were aware of numerous procedural deficiencies related to Alerus's approval of the ESOP Transaction. For example, Kissler knew that the strategy to maximize his own tax savings determined the deadline for closing the transaction by the end of 2015, even though Alerus and its advisors did not start their work until mid-November.

76.     Kissler also had been informed by his representative, Ambrose, that GAAP financials would be needed and he knew that GAAP financials had not been provided.

77.     Ambrose reviewed and edited Chartwell's Fairness Opinion, on which Alerus would rely to evaluate the fairness of the proposed transaction to the ESOP. Kissler's representatives also knew of Chartwell's admission that it had prepared its Fairness Opinion without reviewing some of the documents identified in it as "Information Considered" in reaching its opinion, and that certain financial information was not provided to Chartwell until as late as the evening before the transaction closed.

78.     Finally, Kissler also knew that the ESOP's purchase price was higher than even Ambrose's determination of the value of the ESOP's shares.

## FIRST CLAIM FOR RELIEF
### (Against Defendant Alerus for Breaching Fiduciary Duties Of Loyalty, Prudence, And Adherence To Plan Documents)

79.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 78 inclusive.

80.     As a fiduciary to the ESOP, Alerus had a duty to act prudently and solely in the interest of the ESOP and its participants and beneficiaries. These duties required Alerus to, among other things, thoroughly review, analyze, and question any valuation report on which it

relied; undertake a good-faith investigation of the merits of the transaction and any red flags that arose; and conduct good-faith negotiations over the ESOP Transaction's price and other material terms. Alerus failed in each of these respects.

81.     Alerus rushed its investigation into the ESOP Transaction in order to satisfy an abbreviated timeline dictated by the Sellers' interests.

82.     Alerus failed to scrutinize and critically question the Chartwell Valuation Report, which raised a number of red flags, including:

   a.   projecting an unreasonably high long-term growth rate that exceeded both Norco's near-term projections and the anticipated GDP growth for the entire U.S. economy;

   b.   using an unreasonable 45% debt-to-capital weighting that was completely unsupported by the sources on which Chartwell purportedly relied;

   c.   failing to account for the projected debt needed to fund capital expenditures financed by new bank debt; and

   d.   applying inappropriate discounts to guideline company multiples that failed to account for meaningful differences between Norco and the guideline companies, such as size and geographic disparities.

83.     Alerus failed to investigate whether Chartwell had considered the large discrepancy between the 2012 Willamette Valuation and the Chartwell Valuation Report, which implied a level of growth well beyond Norco's actual growth during this time period.

84.     Alerus overlooked multiple procedural irregularities that compromised the reliability and independence of Chartwell's valuation process.

85.     Alerus did not negotiate in good faith over the purchase price for the ESOP Transaction. Alerus made an opening offer that was more than $5 million above the bottom end of Chartwell's valuation range, allowed Ambrose, the Sellers' representative, to set the parameters of the negotiation and ultimately failed to negotiate a fair transaction price.

86.     By failing in all of the foregoing respects, Alerus:

a.   caused the ESOP to purchase the Company's stock for significantly more than fair market value;

b.   failed to discharge its duties with respect to the ESOP solely in the interest of the participants and beneficiaries of the ESOP and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of 29 U.S.C. § 1104(a)(1)(A);

c.   failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B); and

d.   failed to act in accordance with the documents and instruments governing the ESOP insofar as such documents and instruments are consistent with ERISA, in violation of 29 U.S.C. § 1104(a)(1)(D).

87.     As a result of the conduct described above, Alerus caused losses to the ESOP for which it is liable pursuant to 29 U.S.C. § 1109(a).

## SECOND CLAIM FOR RELIEF
### (Against Defendant Alerus for Engaging in a Prohibited Transaction)

88.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 87 inclusive.

89.     As a fiduciary to the ESOP, Alerus was prohibited from causing or permitting the ESOP to engage in a transaction that constitutes the sale or exchange of property between the ESOP and a "party in interest" to the ESOP, and was prohibited from transferring any assets of the ESOP to a party in interest. 29 U.S.C. § 1106(a)(1)(A), (D).

90.     Kissler was a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(A) as a fiduciary to the ESOP. Kissler was also a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(H) by virtue of his position as CEO and Chairman of Norco's Board of Directors and as the owner of 39.9% of the outstanding Norco shares at the time of the ESOP Transaction.

91.     By causing the ESOP to purchase the Company's stock from Kissler pursuant to the ESOP Transaction, Alerus:

    a.  caused the ESOP to engage in a transaction that it knew or should have known constituted the sale or exchange, or leasing, of any property between the ESOP and parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(A); and

    b.  caused the ESOP to engage in a transaction that that it knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

92.     As a result of the conduct as described above, Alerus caused losses to the ESOP and is liable to make good to the Plan those losses and to restore to the Plan any profits it made in the ESOP Transaction pursuant to 29 U.S.C. § 1109(a).

**THIRD CLAIM FOR RELIEF**
**(Against Defendant Kissler for Breaching Fiduciary Duties Of Loyalty, Prudence, And Adherence To Plan Documents)**

93.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 92 inclusive.

94.     As CEO and Chairman of the Company's Board of Directors, Kissler selected and appointed Alerus to serve as Trustee for the ESOP Transaction and had the authority under the Plan Document to remove Alerus. Kissler therefore had a fiduciary duty to monitor Alerus in the performance of its fiduciary duties.

95.     Kissler knew or should have known about the circumstances that rendered the ESOP Transaction illegal under ERISA, including that Alerus's investigation of the fair market value of the ESOP's shares was flawed. Kissler should have declined to participate in the illegal transaction and replaced Alerus as Trustee to ensure that the investigation of the fair market value of the ESOP's shares and Alerus's representation of the ESOP's interests had satisfied ERISA's requirements. As a result, Kissler failed to fulfill his duty to monitor Alerus, the Plan's Trustee, and to take appropriate action to protect the participants and beneficiaries in violation of ERISA sections 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D).

96.     As a result of the conduct described above, Kissler caused losses to the ESOP for which he is liable pursuant to 29 U.S.C. § 1109(a).

## FOURTH CLAIM FOR RELIEF
### (Against Defendant Kissler for Co-Fiduciary Liability for Alerus' Breaches)

97.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 96 inclusive.

98.     In addition to his liability alleged in the Third Claim for Relief, Kissler is liable as a co-fiduciary for Alerus's breaches under 29 U.S.C. § 1105, which makes a fiduciary "liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . (1) if he participates knowingly in . . . an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or 3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. §§ 1105(a)(1), (2), and (3).

99.     As set forth above, Kissler knew that Alerus rushed its investigation into the ESOP Transaction; failed to scrutinize and critically question Chartwell's valuation report, investigate the large discrepancy between the 2012 Willamette Valuation and the Chartwell Valuation Report, address multiple procedural irregularities that compromised the reliability and independence of Chartwell's valuation process, and negotiate in good faith over the purchase price for the ESOP Transaction; and caused the ESOP to purchase the Company's stock for significantly more than fair market value. Yet, he did not take any action to prevent or remedy the ESOP Transaction. As a result, Kissler "participate[d] knowingly" in Alerus's breach of its fiduciary duties to the ESOP, and is jointly and severally liable for Alerus's breaches pursuant to 29 U.S.C. § 1105(a)(1).

100.     By failing in his duty to monitor Alerus in violation of 29 U.S.C. § 1104(a)(1),

Kissler enabled Alerus to engage in a prohibited transaction and breach its fiduciary duties to the

ESOP, and is jointly and severally liable for Alerus's breaches pursuant to 29 U.S.C.

§ 1105(a)(2).

101.     Despite knowing that Alerus breached its fiduciary duties to the ESOP as set forth

above, Kissler failed to make reasonable efforts to remedy the breaches, and is jointly and

severally liable for Alerus' breaches pursuant to 29 U.S.C. § 1105(a)(3).

### FIFTH CLAIM FOR RELIEF
### (Against Defendant Kissler for Knowing Participation in Alerus's Breaches)

102.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary

adopts and incorporates by reference the averments and allegations of paragraphs 1 through 101

inclusive.

103.     In the alternative to the fiduciary liability alleged in the Third and Fourth Claims

for Relief, even if Kissler did not act in a fiduciary capacity, Kissler is liable for knowingly

participating in Alerus's fiduciary breaches.

104.     Kissler knew or should have known about the circumstances that rendered the

ESOP Transaction illegal under ERISA. Specifically, Kissler knew that Alerus rushed its

investigation into the ESOP Transaction; failed to scrutinize or critically question the Chartwell

Valuation Report, investigate the large discrepancies between the 2012 Willamette Valuation and

the Chartwell Valuation Report, address multiple procedural irregularities that compromised the

reliability and independence of Chartwell's valuation process, and negotiate in good faith over

the purchase price for the ESOP Transaction; and caused the ESOP to purchase the Company's

stock for significantly more than fair market value. Yet, he did not take any action to prevent or

remedy the ESOP Transaction. Kissler should have declined to participate in the illegal

transaction and should have replaced the Trustee to ensure that the investigation of Norco's fair market value and the Trustee's representation of the ESOP's interests had satisfied ERISA's requirements.

105.    Therefore, Kissler knowingly participated in Alerus's violation of 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D) and 29 U.S.C. §§ 1106(a)(1)(A) and (D).

106.    Kissler benefitted from the ESOP's purchase of the Company stock in the ESOP Transaction and is liable to disgorge or otherwise restore to the Plan the excessive amount under 29 U.S.C. § 1132(a)(5).

**PRAYER FOR RELIEF**

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1.    Requiring Alerus to restore all losses caused to the ESOP as a result of Alerus's fiduciary breaches, plus interest.

2.    Requiring Kissler to restore all losses caused to the ESOP as a result of his fiduciary breaches, plus interest.

3.    Requiring Kissler to restore all losses caused to the ESOP as a result of Alerus's fiduciary breaches, plus interest.

4.    Imposing a constructive trust or equitable lien on the proceeds Kissler received from the ESOP Transaction.

5.    Requiring Kissler to account for, disgorge, and restore to the ESOP all proceeds and unjust profits realized from the ESOP Transaction, plus interest.

6.    Granting such other relief as may be equitable, just and proper.

Dated: November 30, 2023            Respectfully Submitted,


SEEMA NANDA
Solicitor of Labor

WAYNE R. BERRY
Associate Solicitor
Plan Benefits Security Division

JEFFREY M. HAHN
Counsel for Appellate and Special Litigation
Plan Benefits Security Division

 /s/ Alyssa C. George
DANA M. FLORKOWSKI
ALYSSA C. GEORGE
Office of the Solicitor
Plan Benefits Security Division
U.S. Department of Labor
P.O. Box 1914
Washington, DC  20013
Tel: (202) 693-5600
Fax: (202) 693-5610

Florkowski.Dana.M@dol.gov
George.Alyssa.C@dol.gov

Attorneys for Plaintiff