Lars C. Golumbic (*pro hac vice*)
Ross P. McSweeney (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, N.W., Suite 1200
Washington, DC 20006
Telephone: (202) 861-6615
Facsimile: (202) 659-4503
lgolumbic@groom.com
rmcsweeney@groom.com

CORY M. CARONE, Bar No. 11422
**STOEL RIVES LLP**
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 387-4210
Facsimile: (208) 389-9040
Cory.carone@stoel.com

*Attorneys for Defendant*
*Alerus Financial, N.A.*

---

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORI CHAVEZ-DEREMER, *in her official capacity as United States Secretary of Labor*,<br><br>Plaintiff,<br><br>v.<br><br>ALERUS FINANCIAL, N.A., JAMES A. KISSLER, NORCO, INC., and NORCO, INC. EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>Defendants. | Case No. 1:23-cv-00537-DCN<br><br>**DEFENDANT ALERUS FINANCIAL, N.A.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT** |

Defendant Argent Alerus Financial, N.A. ("Alerus"), by and through its undersigned counsel, respectfully submits its answer and affirmative defenses to the Complaint (Dkt. 1) filed by the United States Secretary of Labor. Alerus denies each and every allegation in the Complaint,

1

except as specifically admitted herein, and any factual averment admitted herein is admitted only as to the specific facts and not as to any conclusions, arguments, or characterizations which are contained in any averment or in the Complaint as a whole.  To the extent the Complaint contains headings, footnotes, or other material that is inappropriate under Rule 8 and Rule 12(f) of the Federal Rules of Civil Procedure, no response to such material is required.  If, however, a response is required, Alerus denies all headings and footnotes in the Complaint, unless specifically admitted herein.

Alerus answers the specific allegations in the Complaint as follows, and the foregoing statements are incorporated into each numbered paragraph of this Answer numbered paragraphs correspond to the numbered paragraphs of the Complaint.

**PRELIMINARY STATEMENT**

1.      In 2015, James Kissler ("Kissler") decided to sell shares he controlled in his company, Norco, Inc. ("Norco" or "Company"), a privately held North Dakota-based supplier of industrial and medical supplies, equipment, and specialty gases, to the Norco, Inc. Employee Stock Ownership Plan and Trust ("ESOP" or "Plan"), a newly created retirement plan established for the benefit of Norco's employees.

**ANSWER:** Alerus admits that in 2015 James Kissler sold shares in Norco, a privately-held company, to the ESOP, a newly created retirement plan established for the benefit of Norco's employees. Alerus denies the remaining the allegations in Paragraph 1.

2.      In November 2015, Kissler hired Alerus Financial, N.A. ("Alerus") to act as the Plan's trustee and independent fiduciary for the transaction. The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.,* requires such fiduciaries to act

prudently and with undivided loyalty to the plan, and to pay no more than fair market value for the stock.

**ANSWER:** Alerus denies that it was hired by Kissler, but admits that it was engaged by Norco to act as the Plan's trustee and independent fiduciary for the transaction pursuant to terms set forth in an engagement letter or agreement. The second sentence of Paragraph 2 purports to paraphrase ERISA, a statute that speaks for itself. states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in the second sentence of Paragraph 2.

3. Just a month later, in December 2015, Alerus authorized the Plan to pay Kissler and a related family foundation (collectively the "Sellers") more than $140 million for 35% of Norco's stock (the "ESOP Transaction"), without conducting a good faith investigation of the stock's fair market value. In particular, Alerus rushed its due diligence in order to close the transaction on the Sellers' preferred timetable, and in the process relied on a valuation report rife with manifest flaws that substantially overvalued the stock. Indeed, that report valued Norco at an amount nearly 250% greater than the value reached by a reputable valuation firm retained by Norco roughly three and a half years earlier.

**ANSWER:** The first sentence in Paragraph 3 purport to characterize the terms of the ESOP Transaction, which are reflected in a stock purchase agreement and other transaction documents that speak for themselves. Alerus denies any allegations that are inconsistent with the terms of the ESOP Transaction. Alerus denies the remaining allegations in Paragraph 3.

4. As a result of its actions and omissions, Alerus caused the Plan to overpay by tens of millions of dollars, breached its duties of prudence and loyalty, and engaged in a transaction prohibited by ERISA.

**ANSWER:** Paragraph 4 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 4.

5.      As CEO and Chairman of Norco's Board of Directors at the time of the ESOP Transaction, Kissler was closely involved in all aspects of the Company and the ESOP Transaction, and he knew Alerus's negotiation and investigation of the fair market value of the ESOP's shares was flawed. In allowing Alerus—which Kissler appointed as trustee and was required to monitor—to enter into this transaction, and otherwise failing to monitor Alerus, Kissler violated his own fiduciary duties of prudence, loyalty, and adherence to plan documents, and knowingly participated in Alerus's ERISA violations.

**ANSWER:** Alerus admits that Kissler was the CEO and Chairman of Norco's Board of Directors at the time of the ESOP Transaction, but denies that Kissler appointed Alerus as trustee. Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 5 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies. The second sentence of Paragraph 5 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the remaining allegations in the second sentence of Paragraph 5.

## JURISDICTION AND VENUE

6.      This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA sections 409 and 502(a)(2) and (a)(5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (a)(5), to redress violations and enforce the provisions of Title I of ERISA.

**ANSWER:** Paragraph 6 states legal conclusions to which no response is required. To the extent a response is required, Alerus admits that Plaintiff purports to bring this action under

4

ERISA. Alerus denies that any of Plaintiff's claims are valid or that Plaintiff is entitled to any of the relief sought for her claims.

7.      This Court has jurisdiction over this action pursuant to ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(1).

**ANSWER:** Paragraph 7 states legal conclusions to which no response is required. To the extent a response is required, Alerus admits that Plaintiff purports to bring this action under ERISA.

8.      Venue with respect to this action lies in the United States District Court for the District of Idaho, pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ESOP is administered in Boise, Idaho, within this district.

**ANSWER:** Paragraph 8 states legal conclusions to which no response is required. To the extent a response is required, Alerus admits that Plaintiff purports to bring this action under ERISA and that the ESOP is administered in Boise, Idaho.

### PARTIES

9.      The Secretary is authorized to enforce Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries and other parties who violate ERISA and other parties who knowingly participate in those violations. 29 U.S.C. § 1132(a)(2), (5).

**ANSWER:** Paragraph 9 states legal conclusions to which no response is required. To the extent a response is required, Alerus admits that Plaintiff purports to bring this action under ERISA. Alerus denies that any of Plaintiff's claims are valid or that Plaintiff is entitled to any of the relief sought for her claims.

10.      Alerus is a subsidiary of Alerus Financial Corporation, both of which are headquartered in Grand Forks, North Dakota. Alerus is a national service provider to retirement

5

plans and regularly provides independent trustee and fiduciary services in connection with employee stock ownership plans, including acting as the independent trustee of such plans. At all relevant times, Alerus was an independent trustee of the ESOP and a fiduciary to the ESOP under 29 U.S.C. § 1002(21)(A)(i) and (iii).

**ANSWER:** Alerus denies the allegations in the last sentence of Paragraph 10, except that Alerus admits that it served as trustee and independent fiduciary to the ESOP at certain times. Alerus admits the remaining allegations in Paragraph.

11.    At all relevant times, Kissler was Norco's CEO and Chairman of Norco's Board of Directors. Kissler appointed Alerus to serve as an independent trustee for the ESOP and had the authority to remove Alerus as the ESOP Trustee. At all relevant times, Kissler was a fiduciary to the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) and (iii). Kissler was also a party in interest to the ESOP because he (1) was a fiduciary to the ESOP, (2) was CEO and Chairman of Norco's Board of Directors at the time of the ESOP Transaction, and (3) owned 39.9% of the outstanding Norco shares at the time of the ESOP Transaction. *See* 29 U.S.C. § 1002(14)(A), (H).

**ANSWER:** Alerus admits that Kissler was Norco's CEO and Chairman of Norco's Board of Directors at the time of the ESOP Transaction. Alerus denies that it was appointed to any role by Kissler, but admits that it was engaged by Norco to serve as an independent trustee for the ESOP pursuant to terms set forth in an engagement letter or agreement. The second and third sentences of Paragraph 11 state legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in the second and third sentences of Paragraph 11.

12.    The ESOP is an employee benefit plan as defined by 29 U.S.C. § 1002(3) and subject to coverage under ERISA pursuant to 29 U.S.C. § 1003(a)(1). The ESOP also includes the

Norco, Inc. Employee Stock Ownership Trust, which holds the ESOP's assets. The ESOP is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

**ANSWER:** Paragraph 12 states legal conclusions to which no response is required.  To the extent a response is required, Alerus admits that the ESOP, at certain times, was intended to be an ESOP under 29 U.S.C. § 1107(d)(6) that was intended to meet the requirements of Section 4975(e)(7) of the Internal Revenue Code and related regulations. Alerus denies the remaining allegations in Paragraph 12.

13.     At all relevant times, Norco was the Plan sponsor as defined in ERISA section 3(16)(B)(i), 29 U.S.C. § 1002(16)(B)(i). As the employer whose employees are covered by the Plan, Norco was a party in interest pursuant to ERISA section 3(14)(C), 29 U.S.C. § 1002(14)(C). Norco is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

**ANSWER:** Paragraph 13 states legal conclusions to which no response is required.  To the extent a response is required, Alerus denies the allegations in Paragraph 13, except that Alerus admits that Plaintiff purports to paraphrase, quote, and/or cite to certain ERISA provisions, but Alerus relies on those provisions to speak for themselves rather than on Plaintiff's characterizations thereof, and deny the allegations to the extent they are inconsistent with the cited statutory provisions.

## FACTUAL BACKGROUND

14.     Incorporated in Boise, Idaho in 1967, Norco is a regional distributor of industrial equipment and supplies, medical equipment, and industrial chemicals and gases. Kissler purchased Norco from his father, Larry Kissler, in 1985.

7

**ANSWER:** Alerus lacks sufficient knowledge and information to admit or deny the allegations in Paragraph 14, and therefore denies them.

15.    In 2015, the year of the ESOP Transaction, Norco had approximately 1,200 employees and operated approximately 65 retail and wholesale locations in Idaho, Oregon, Washington, Montana, Nevada, Utah, and Wyoming.

**ANSWER:** Alerus lacks sufficient knowledge and information to admit or deny the allegations in Paragraph 15, and therefore denies them.

16.    Norco is governed by a Board of Directors. At the time of the ESOP Transaction, Kissler served as Chairman of Norco's Board. The other Board members at that time included his daughter, Nicole Kissler, as well as Randy Hales, Cheryl Larabee, Greg Vasek, and Larry Aarsby. Kissler also served as Norco's CEO at the time of the ESOP Transaction. Ned Pontious served as Norco's President and Mike Sabin served as Norco's Chief Financial Officer.

**ANSWER:** Alerus admits that Norco is governed by a Board of Directors and that at the time of the ESOP Transaction Kissler served as Chairman of Norco's Board. Alerus lacks sufficient knowledge and information to admit or deny the remaining allegations in Paragraph 16, and therefore denies them.

## Norco's Stock is Valued at $138.4 Million Less than Four Years Before the ESOP Transaction

17.    Prior to the ESOP Transaction, the most recent Norco stock transaction occurred in November 2012, when Kissler transferred 3,900 shares of non-voting Norco common stock to the McKenzie GT Trust.

**ANSWER:** Alerus lacks sufficient knowledge and information to admit or deny the allegations in Paragraph 17, and therefore denies them.

18.    In order to determine the value of this stock, Norco hired a valuation advisor, Willamette Management Associates ("Willamette"), to provide a fair market valuation for Norco's stock. Willamette's valuation concluded that the fair market value of 100% of Norco's equity on a nonmarketable, noncontrolling basis, as of February 29, 2012, was $138.4 million.

**ANSWER:** Alerus admits that Norco hired Willamette and that Willamette provided a valuation. Alerus responds further that Paragraph 18 purports to characterize Willamette's valuation, which speaks for itself. Alerus denies any allegations in Paragraph 18 to the extent that they are inconsistent with Willamette's valuation. Alerus lacks sufficient knowledge and information to admit or deny the circumstances of Willamette's engagement, and therefore denies the remaining allegations in Paragraph 18.

### Kissler Hires Ambrose to Quarterback the ESOP Transaction

19.    In or around 2015, Kissler decided to inquire into establishing an ESOP to which he could sell some of the Norco shares that he controlled.

**ANSWER**: Alerus admits that Norco established an ESOP in 2015.  Alerus lacks sufficient knowledge and information to admit or deny the remaining allegations in Paragraph 19, and therefore denies them.

20.    In August 2015, Kissler selected Ambrose Capital Partners, LLC ("Ambrose") to serve as a financial advisor to Norco in a potential sale of Norco stock to the ESOP. Ambrose's responsibilities for the initial phase of the engagement ("Phase 1") included modeling and structuring a potential ESOP transaction, analyzing historical and forecasted cash flows, preparing a preliminary valuation of the Company for purposes of the ESOP Transaction, and preparing a presentation summarizing its analyses.

**ANSWER**: Alerus admits that Ambrose was engaged as a financial advisor to Norco regarding the potential sale of Norco stock to the ESOP. Alerus lacks sufficient knowledge and information to admit or deny who selected Ambrose or what Ambrose's responsibilities were, and therefore denies the remaining allegations in Paragraph 20.

21.     Ambrose gave a presentation to Norco and Kissler in November 2015 in which it summarized Norco's objectives in the ESOP Transaction as, among other things, creating a "liquidity event" for the Sellers and exploring "all available tax benefits from the [ESOP] transaction, including the ability of the Selling Shareholders to defer capital gains taxes under IRC Section 1042."

**ANSWER**: Paragraph 21 purports to quote, paraphrase, or characterize Ambrose's presentation, which speaks for itself . Alerus denies any allegations to the extent they are inconsistent with Ambrose's presentation. Alerus lacks sufficient knowledge and information to admit or deny the remaining allegations in Paragraph 21, and therefore denies them.

22.     In its November 2015 presentation to Norco and Kissler, Ambrose valued a 35% preferred equity stake in Norco (including the value of preferred dividends) at $139.1 million.

**ANSWER**: Paragraph 22 purports to characterize Ambrose's presentation, which speaks for itself. Alerus lacks sufficient knowledge and information to admit or deny the remaining allegations in Paragraph 22, and therefore denies them.

23.     In its November 2015 presentation to Norco and Kissler, Ambrose described the anticipated ESOP Transaction as closing "on or before December 31, 2015."

**ANSWER**: Paragraph 23 purports to quote, paraphrase, or characterize Ambrose's presentation, which speaks for itself. Alerus lacks sufficient knowledge and information to admit or deny the remaining allegations in Paragraph 23, and therefore denies them.

10

24.    Following that presentation, Kissler engaged Ambrose for a second "Transaction Implementation" phase ("Phase 2") for the anticipated transaction. Ambrose's responsibilities for the Phase 2 engagement included managing the due diligence process, identifying other advisors for the ESOP Transaction, and negotiating the transaction terms with the ESOP Trustee.

**ANSWER**: Paragraph 24 purports to characterize the terms of Ambrose's engagement agreement, which speaks for itself. Alerus lacks sufficient knowledge and information to admit or deny the remaining allegations in Paragraph 24, and therefore denies them.

### Ambrose Contacts Alerus About Serving as the ESOP Trustee

25.    In October 2015, Ambrose contacted Alerus about serving as the ESOP's transactional trustee to represent the ESOP in deciding whether and on what terms to purchase Norco stock from Kissler.

**ANSWER**: Alerus admits that Ambrose contacted it in October 2015 regarding serving as the ESOP's transactional trustee.

26.    Ambrose informed Alerus that the estimated size of the transaction was between $100 million and $120 million, and that the anticipated closing date of the transaction was December 31, 2015. Alerus recorded both facts in an internally prepared engagement summary dated October 22, 2015.

**ANSWER**: Paragraph 26 purports to characterize or quote an internally prepared engagement summary, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with the engagement summary.

27.    Though not yet formally engaged, Alerus quickly moved to line up its advisors for the anticipated ESOP Transaction: Chartwell Financial Advisory, Inc. ("Chartwell") as its valuation advisor, and McDermott, Will, & Emery ("MWE") as its legal advisor.

**ANSWER**: Alerus admits that it engaged Chartwell to serve as a valuation advisor and MWE as a legal advisor for the ESOP Transaction. Alerus denies the remaining allegations in Paragraph 27 to the extent they mischaracterize Alerus's process for engaging its advisors.

28.     On October 23, 2015, Nels Carlson of Alerus emailed Chartwell's Steve Nelson and MWE's Allison Wilkerson to say that he had just spoken with Mike Harden of Ambrose who "indicated that Norco was comfortable moving forward with Alerus and our selected, independent advisors in connection with the potential ESOP transaction."

**ANSWER**: Paragraph 28 purports to quote, paraphrase, or characterize Carlson's email, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Carlson's email.

29.     On October 26, 2015, Ambrose informed Alerus that MWE's fees for the potential transaction were not to exceed $80,000 and that Chartwell's fees were not to exceed $85,000.

**ANSWER**: Paragraph 29 purports to characterize or quote a communication from Ambrose to Alerus, which communication speaks for itself. Alerus denies any allegations to the extent they are inconsistent with this communication.

30.     On November 2, 2015, Chartwell agreed to serve as Alerus's financial advisor on the prospective ESOP Transaction, and MWE agreed to serve as its legal advisor. Both engagement agreements—which were not formally executed until early December—included the fee caps imposed by Ambrose.

**ANSWER**: Paragraph 30 purports to characterize Chartwell and MWE's engagement agreements or similar contractual documents, which speaks for themselves. Alerus denies any allegations to the extent they are inconsistent with those engagement agreements. Alerus denies

12

the remaining allegations in Paragraph 30 to the extent they mischaracterize Alerus's process for engaging its advisors.

31.    On November 9, 2015, Alerus, Chartwell, and MWE met with Ambrose and Norco regarding the proposed transaction. During the meeting, Ambrose increased its representation of the value of the ESOP's 35% interest to $160.7 million.

**ANSWER**: Alerus admits that it met with Chartwell, MWE, Ambrose, and Norco regarding the proposed transaction on or around November 9, 2015. Paragraph 31 purports to characterize or quote statements made during such meeting, which, to the extent there are contemporaneous notes of this meeting, speaks for themselves. Alerus denies any allegations to the extent they are inconsistent with these notes.

32.    At this point Alerus itself still had not formally agreed to serve as the ESOP's trustee. Before it could sign an engagement agreement, the leadership of Alerus's Retirement Services division had to first approve of the potential engagement.

**ANSWER**: Alerus admits that acceptance of a formal engagement required approval of its leadership, but denies the allegations to the extent they mischaracterize Alerus's engagement approval process.

33.    To that end, on November 10, 2015, Mike Flesch, Alerus's Director of Fiduciary Services, emailed John Flesch, Alerus's Executive Vice President, seeking such approval, and noting that Alerus has "completed several transactions structured by Michael Harden [of Ambrose] in recent years." The email attached an updated engagement summary, reflecting Ambrose's increased representation of the value of the ESOP's shares, listing the expected transaction amount as between $135 million and $160 million. The updated engagement summary continued to list an anticipated closing date of December 31, 2015.

13

**ANSWER**: Paragraph 33 purports to quote, paraphrase, or characterize Mike Flesch's email and its attachments, which speak for themselves. Alerus denies any allegations to the extent they are inconsistent with Mike Flesh's email and its attachments.

34.     That same day (November 10, 2015), John Flesch approved Alerus's participation as trustee of the Norco ESOP. As of November 10, 2015, when Alerus agreed to serve as ESOP trustee for purposes of the ESOP Transaction, it also understood that it would become the ongoing trustee of the Norco ESOP if the transaction were to close.

**ANSWER**: Alerus admits that on November 10, 2015, John Flesch approved Alerus's participation as trustee of the Norco ESOP and that Alerus understood it was possible that Norco could engage it to become the ongoing trustee of the Norco ESOP. Alerus denies the remaining allegations in Paragraph 34.

### Kissler Formally Appoints Alerus as Trustee

35.     On November 24, 2015, Kissler, as Norco's CEO, and Alerus executed an agreement for Alerus to serve as the transactional ESOP Trustee for the proposed purchase of Norco stock by the ESOP.

**ANSWER**: Norco admits that on or about November 24, 2015, it was engaged to serve as the transactional ESOP Trustee. Alerus denies any allegations to the extent they are inconsistent with the engagement agreement and to the extent they characterize Alerus's engagement as ESOP Trustee as being with Kissler personally.

36.     Pursuant to the Trustee Engagement Agreement, as the ESOP Trustee, Alerus was responsible for:

> Reviewing, analyzing, and making a determination as to whether the ESOP should approve, consent to, and/or otherwise engage in certain proposed transactions that may include: (i) a purchase of common stock by the ESOP; (ii) a redemption of common stock by the Company; (iii) the implementation of

14

certain performance incentive and/or compensation arrangements for key management employees of the Company; and such other transactions and/or stock disposition which, separately or in combination may result in the ESOP owning a minority interest in the Company's common stock.

**ANSWER**: Paragraph 36 purports to quote, paraphrase, or characterize Alerus's engagement agreement, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with the engagement agreement.

37.    Alerus acknowledged that it was a "fiduciary," that it would continue to serve as a fiduciary "until such time as it resigns, is removed, or upon the completion or cancellation of the proposed engagement," and that in performing these services, it would "act independently to perform all actions and execute all documents necessary or required to negotiate transaction terms and conditions that are in the 'best interests of Plan participants' and consistent with the requirements of the plan document and applicable law."

**ANSWER**: Paragraph 37 purports to quote, paraphrase, or characterize Alerus's engagement agreement, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with the engagement agreement.

### Alerus Prepares Offer on the Same Day it Receives Chartwell's Draft Valuation Report

38.    On November 25, 2015, Ambrose, on behalf of the Sellers, conveyed an opening offer to Alerus of $160.7 million for a 35% equity interest in Norco.

**ANSWER**: Alerus admits the allegations in Paragraph 38.

39.    On December 3, 2015, Chartwell sent Alerus a 62-page draft report valuing a 35% equity interest in Norco at between $129.9 to $150.9 million ("Draft Valuation Report").

**ANSWER**: Paragraph 39 purports to characterize Chartwell's Draft Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Draft Valuation Report.

40.    That very same day, Alerus met with Chartwell and MWE to discuss Chartwell's Draft Valuation Report and Ambrose's offer.

**ANSWER**: Alerus admits it met with its advisors to discuss Chartwell's Draft Valuation Report on or about December 3, 2015. Chartwell denies the allegations in Paragraph 40 to the extent they mischaracterize Alerus's process for reviewing draft valuation reports prepared by its financial advisors generally or by Chartwell specifically in this instance.

41.    Also on that same day (December 3, 2015), after meeting with its advisors, Alerus instructed MWE to prepare a $135 million counteroffer on behalf of the ESOP—a starting position more than $5 million higher than the bottom end of Chartwell's preliminary range, but precisely aligning with the bottom end of the revised estimate Alerus had prepared in early November based on information from Ambrose.

**ANSWER**: Alerus admits that on or about December 3, 2015, it instructed MWE to prepare a counteroffer on behalf of the ESOP. Alerus denies the allegations in Paragraph 41 to the extent it mischaracterizes Alerus's deliberations for formulating a counteroffer to the Sellers' opening offer.

42.    MWE conveyed Alerus's $135 million counteroffer to Ambrose on December 8, 2015.

**ANSWER**: Alerus admits the allegations in Paragraph 42.

43.    After exchanging additional offers during the ensuing week, Alerus agreed to accept Ambrose's $145 million offer. On December 18, after certain adjustments, the purchase price was set at $141.58 million.

**ANSWER**: Alerus admits that it agreed to a purchase price of $145 million, which was later reduced after certain adjustments to $141.58 million.

16

**<u>Chartwell Drafts its Fairness Opinion Without Reviewing Some Referenced Documents
and Provides its Draft Fairness Opinion to Ambrose Before Issuing its Final Opinion</u>**

44.    Chartwell provided a draft Fairness Opinion to Alerus on the evening of December 21, 2015. When it transmitted the draft opinion, Chartwell informed Alerus that it had not yet seen some of the documents referenced in the document as "Information Considered" in reaching its opinion.

**ANSWER**: Alerus admits that Chartwell provided a draft Fairness Opinion to Alerus on December 21, 2015. Alerus denies the allegations in Paragraph 44 to the extent they mischaracterize the completeness of Chartwell's draft Fairness Opinion.

45.    Before issuing its final fairness opinion to Alerus, Chartwell provided its draft opinion to Ambrose, the advisor to the Sellers. Ambrose provided redline edits and comments on its contents and conclusions, and Chartwell incorporated several of Ambrose's edits into the final version of its fairness opinion. Alerus knew both that Chartwell provided its draft fairness opinion to Ambrose and that Ambrose provided edits to the opinion.

**ANSWER**: Alerus admits that Chartwell shared a draft Fairness Opinion with Ambrose, but denies the allegations in Paragraph 45 to the extent they suggest Alerus violated ERISA in any way by allowing Chartwell to share its draft Fairness Opinion with Ambrose.

46.    Chartwell issued Alerus a final Fairness Opinion dated December 23, 2015, in which Chartwell opined that "the consideration to be paid by the Trust for the ESOP Shares . . . is not greater than the fair market value" of those shares, and "the terms of the overall Transaction are fair to the Trust from a financial point of view."

**ANSWER**: Paragraph 46 purports to quote, paraphrase, or characterize Chartwell's final Fairness Opinion, which speaks for itself. Alerus denies any allegations to the extent they are

17

inconsistent with Chartwell's final Fairness Opinion. Alerus denies the remaining allegations in Paragraph 46.

**Chartwell's Final Valuation Report Contains Numerous Red Flags**

47.     On December 23, 2015, Chartwell issued to Alerus a final opinion of the fair market value of Norco's stock ("Final Valuation Report"). Chartwell used one income-based approach—the discounted cash flow ("DCF") method—and two market-based approaches—the guideline public company method and the merger and acquisition method—to calculate its range of fair market value. The Final Valuation Report provided a fair market value range for a 35% interest in Norco of $125.95 to $146.95 million.

**ANSWER**: Alerus admits that Chartwell provided a Final Valuation Report on or about December 23, 2015. Chartwell's Final Valuation Report speaks for itself, and Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report.

Red Flag #1: Unreasonably High Long-term Growth Rate

48.     The DCF method values a company by projecting its future free cash flows and converting them to their present value equivalent using a discount rate. It consists of two components: (1) a projection of the company's near-term cash flows (often referred to as the "discrete period") and (2) a projection of long-term cash flows following the discrete period (the latter projection is referred to as the "terminal value"). Because long-term growth is generally harder to predict than near-term growth, the growth-rate assumptions used or implied by the terminal value calculation should generally be more conservative than those use for the discrete period.

**ANSWER**: Paragraph 48 sets forth a generalized description of business valuation principles, which are matters of expert testimony to which no response is required. To the extent

18

a response is deemed necessary, Alerus denies the allegations in Paragraph 48, including any mischaracterization of such principles.

49.    For its discrete period projections, Chartwell assumed that Norco's net sales would achieve a compound annual growth rate of 5.2% for the five years following the transaction.

**ANSWER**: Paragraph 49 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report.

50.    Yet Chartwell's terminal value calculation implied a long-term growth rate for Norco into perpetuity of *6.8%*. This rate not only exceeded Chartwell's near-term growth assumptions for Norco, it also exceeded other standard reasonableness checks such as anticipated GDP growth in the entire U.S. economy for 2016. The Final Valuation Report did not explain why its long-term growth assumption for Norco exceeded its near-term growth assumption for Norco and anticipated GDP growth.

**ANSWER**: Paragraph 50 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report.

Red Flag #2: Unreasonable Capital Structure Assumption

51.    To determine the discount rate it would apply to convert Norco's future cash flows to a present value in its DCF analysis, Chartwell calculated Norco's weighted average cost of capital ("WACC"). A WACC calculation involves determining (a) the rate of return an equity investor in the company would demand taking into account the company's risk profile ("cost of equity"), (b) the interest rate a bank would demand for issuing debt to the company ("cost of debt"), and then (c) ascribing a "weighting" to the cost of equity and cost of debt based on the company's

capital structure. All things equal, the lower the discount rate (or WACC), the higher the DCF valuation.

**ANSWER**: Paragraph 51 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report.

52.   The Final Valuation Report determined that Norco's cost of debt was 3.6%, compared to its cost of equity of 17.7%. As a result, the more weighting Chartwell ascribed to Norco's cost of debt, the lower the resulting WACC that would be used to discount future cash flows, and the higher the resulting DCF valuation. Alerus denies the remaining allegations in Paragraph 52.

**ANSWER**: Paragraph 52 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report.

53.   In its Final Valuation Report, Chartwell assigned a *45%* weighting to Norco's cost of debt even though (1) over the preceding four years, debt made up an average of only 24.5% of Norco's capital structure, and (2) Chartwell determined that, for the Norco "peer group" companies Chartwell selected for its guideline public company method, both their median and mean capital structures over the preceding five years never exceeded 20% debt. The Final Valuation Report nowhere explains the basis for choosing a 45% debt weighting for Norco when neither Norco's own history nor peer group data supported such a high weighting.

**ANSWER**: Paragraph 53 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report. Alerus denies the remaining allegations in Paragraph 53.

Red Flag #3: Failure to Adjust Norco's Debt to Account for New Plant Project

54.    In the Final Valuation Report's DCF analysis, Chartwell removed approximately $21 million in capital expenditures that Norco had projected in connection with building a new air separation plant, supposedly because Norco was planning on financing that portion of the plant with bank debt. If that were true, Chartwell would have needed to *add* a corresponding amount to Norco's debt in its valuation, which would have reduced its resulting valuation. The Final Valuation Report failed to do so.

**ANSWER**: Paragraph 54 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report. Alerus denies the remaining allegations in Paragraph 54.

Red Flag #4: Reliance on Incomparable Guideline Companies

55.    The guideline public company method values a company by identifying valuation multiples derived from publicly traded guideline companies and then applying those multiples to the subject company's financials. Chartwell acknowledged extreme disparities in size and geographic reach between Norco and the guideline companies it used for this method; for example, the median net sales of the guideline companies was more than thirty times higher than Norco's. But Chartwell failed to appropriately discount its selected guideline company multiples to account for these significant differences before using those multiples to determine Norco's enterprise value.

**ANSWER**: Paragraph 55 purports to characterize business valuation principles that are the proper subject of expert testimony, to which no response is required. Paragraph 55 further purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report or are

21

subject to expert testimony. To the extent a response is required, Alerus denies the allegations in Paragraph 55.

Red Flag #5: Failure to Account for Disparity with Willamette Valuation

56.    The Willamette Valuation had concluded that the fair market value of 100% of Norco's equity on a nonmarketable, noncontrolling basis on February 29, 2012, was $138.4 million. Yet in its Final Valuation Report issued on December 23, 2015, Chartwell valued 100% of Norco's equity on the same nonmarketable, noncontrolling basis at a range of $319 to $379 million. The midpoint of Chartwell's equity value—$349 million—was 250% greater than Willamette's valuation a few years earlier.

**ANSWER**: Paragraph 56 purports to characterize Chartwell's Final Valuation Report and the Willamette Valuation, which speak for themselves. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report or the Willamette Valuation. Alerus denies the remaining allegations in Paragraph 56.

57.    In contrast, between 2011 (which was the year before Willamette's February 2012 valuation) and the time of Chartwell's Final Valuation Report in December 2015, Norco's revenues increased by only 29%, from $220 million to $285 million.

**ANSWER**: Alerus denies the allegations in Paragraph 57 to the extent they mischaracterize Norco's financial performance.

58.    Chartwell's Final Valuation Report did not explain the disparity between its valuation and the one Willamette derived a few years earlier.

**ANSWER**: Paragraph 58 purports to characterize Chartwell's Final Valuation Report, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with Chartwell's Final Valuation Report. Alerus denies the remaining allegations in Paragraph 58.

22

Red Flag #6: Reliance on Unaudited Financial Statements Not Prepared on a GAAP Basis

59.    Alerus knew the Chartwell Valuation Report was based on unaudited financial statements that were not prepared according to Generally Accepted Accounting Principles (GAAP). This deviated from Alerus' typical practice for the employee stock ownership plan transactions it works on.

**ANSWER**: Alerus denies the allegations in Paragraph 59 to the extent they mischaracterize Chartwell's reliance on unaudited financial statements as improper or in any way inconsistent with business valuation principles.

Red Flag #7: Last-Minute Disclosure of Financial Information

60.    Alerus was aware of additional information regarding Norco's finances that Chartwell could not have incorporated into its valuation, given the timing of the disclosures. For example, on December 22, the evening before the ESOP Transaction closed, Norco's representatives disclosed approximately $6 million in bonus depreciation that had not been reflected in the financial statements or forecast that were previously provided, as well as news that Norco planned to pay its then-President a severance package totaling $1.5 million starting in 2017 or 2018.

**ANSWER**: Alerus denies the allegations in Paragraph 60 to the extent they mischaracterize the disclosures referenced therein as untimely or material to Chartwell's valuation.

61.    As a result of these and other flaws, the Chartwell Valuation Report reached an inflated conclusion of Norco's value and overstated the fair market value of the ESOP's shares by tens of millions of dollars.

**ANSWER**: Alerus denies the allegations in Paragraph 61.

23

**Alerus Signs Off on ESOP Transaction Just Six Weeks After Agreeing to Serve as Trustee**

62.     On December 23, 2015, Alerus, acting as ESOP Trustee, entered into a Stock Purchase Agreement with the Sellers in which it approved the ESOP's purchase of 3,500,000 convertible preferred shares of Norco from the Sellers for $141.58 million, subject to certain post-closing adjustments. The ESOP secured this purchase with an internal loan between the ESOP and Norco, with Alerus signing on the ESOP's behalf.

**ANSWER:** Alerus admits that on or about December 23, 2015, it entered into a Stock Purchase Agreement on the ESOP's behalf. Paragraph 62 purports to characterize the terms of the Stock Purchase Agreement, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with the terms of the Stock Purchase Agreement. Alerus denies the remaining allegations in Paragraph 62.

## The ESOP Is Formally Created

63.     The ESOP was established with an effective date of January 1, 2015. Under the document governing the Plan, the Plan Administrator of the ESOP was the "ESOP Committee," which was to be appointed by the Company. In the absence of such a committee, Norco's Board of Directors assumed the powers, duties and responsibilities of the ESOP Committee. At the time of the ESOP Transaction, Norco had not yet appointed an ESOP Committee. Accordingly, Norco's Board of Directors, led by Kissler, had the "powers, duties, and responsibilities" of administering the ESOP. The Plan Document also provided that the "Company shall have the sole authority to appoint and remove the Trustee."

**ANSWER:** Alerus admits that the ESOP was established effective January 1, 2015. Paragraph 63 purports to quote, paraphrase, or characterize the terms of the Plan's governing plan document (the "Plan Document"), which speaks for itself. Alerus denies any allegations to the

24

extent they are inconsistent with the terms of the Plan Document. Alerus denies the remaining allegations in Paragraph 63.

64.     The Plan Document further provided that no "asset of the Trust" may be "used for, or diverted to, purposes other than the exclusive benefit of the Participants or their Beneficiaries."

**ANSWER:** Paragraph 64 purports to quote, paraphrase, or characterize the terms of the Plan Document, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with the terms of the Plan Document. Alerus denies the remaining allegations in Paragraph 64.

65.     The Trust Agreement between Norco and Alerus provided that "[a]ll purchases or exchanges of Employer Securities shall be for no more than 'adequate consideration,' as defined in Section 3(18) of ERISA."

**ANSWER:** Paragraph 65 purports to quote, paraphrase, or characterize the terms of the Trust Agreement, which speaks for itself. Alerus denies any allegations to the extent they are inconsistent with the terms of the Trust Agreement. Alerus denies the remaining allegations in Paragraph 65.

66.     In 2016, pursuant to the Stock Purchase Agreement, the purchase price and internal loan amount were adjusted to $143,214,162.

**ANSWER**: Alerus admits that, pursuant to the Stock Purchase Agreement, the purchase price and internal loan amount were adjusted to $143,214,162 in 2016. Paragraph 66 purports to characterize the Stock Purchase Agreement, which speaks for itself. Alerus denies any allegations in Paragraph 66 to the extent they are inconsistent with the Stock Purchase Agreement. Alerus denies the remaining allegations in Paragraph 66.

**Kissler Was a Fiduciary to the ESOP and Knew the ESOP Overpaid Amidst a Compromised Valuation Process**

67.    At the time of the ESOP Transaction, Kissler was a fiduciary to the ESOP because he appointed Alerus and retained a duty to monitor Alerus.

**ANSWER:** Paragraph 67 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies that Kissler personally appointed Alerus and denies the remaining allegations in Paragraph 67.

68.    Kissler knew the purchase price approved by Alerus caused the ESOP to overpay for its Norco shares.

**ANSWER**: Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 68 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge that Alerus caused the ESOP to overpay for its Norco shares, which Alerus denies.

69.    At the time of the ESOP Transaction, Kissler was Norco's longtime CEO and Chairman of its Board of Directors, as well as Norco's largest shareholder, and was closely familiar with all aspects of Norco's operations and financial status.

**ANSWER**: Alerus admits that at the time of the ESOP Transaction, Kissler was Norco's CEO and Chairman of its Board of Directors and Norco's largest shareholder. Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 69 as to Kissler's knowledge, and therefore denies them.

70.    For example, Kissler, along with Sabin, developed Norco's financial projections, including the projections that formed the basis for the Chartwell Valuation Report, and Kissler gave final approval to the projections.

**ANSWER**: Alerus lacks knowledge and information sufficient to admit or deny the allegations in Paragraph 70, and therefore denies them.

71.     Kissler knew that Willamette valued 100% of Norco's equity on a nonmarketable, noncontrolling basis as of February 29, 2012, at $138.4 million. In fact, Kissler had similarly provided the financial and company information Willamette used to prepare that valuation. And Kissler thereafter relied upon the Willamette Valuation's conclusion of fair market value when he transferred some of his shares to the McKenzie GT Trust. Kissler thus knew that the purchase price for the ESOP Transaction represented a drastic increase in value compared to the Willamette Valuation that Norco's performance between 2012 and 2015 did not justify.

**ANSWER**: Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 71 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies. Alerus denies the remaining allegations in Paragraph 71.

72.     Kissler was closely involved in formulating and carrying out the ESOP Transaction. For example, Kissler selected and engaged the parties who would negotiate both sides of the deal: Ambrose for the Sellers, and Alerus for the ESOP.

**ANSWER**: Alerus admits that Kissler was involved in the ESOP Transaction. Alerus denies that Kissler engaged Alerus.  Alerus lacks sufficient knowledge and information to form a belief as to the remaining allegations in Paragraph 72, and therefore denies them.

73.     Kissler also actively participated in a November 9, 2015, meeting during which he, other Norco management, and Ambrose presented a summary of the proposed transaction and Company financial information to Alerus and Chartwell.

**ANSWER**: Alerus admits that it attended a meeting with Kissler on or about November 9, 2015, but denies the allegations in Paragraph 73 to the extent that they mischaracterize Kissler's participation in that meeting.

74.     Kissler's chosen representative, Ambrose, dictated the structure, financing, and timeline of the transaction; provided valuation estimates to Alerus and its advisors; and represented the Sellers in negotiations with Alerus.

**ANSWER**: Alerus admits that Ambrose represented the Sellers in negotiations with Alerus, but lacks sufficient knowledge and information to form a belief as to the allegation that Ambrose was Kissler's chosen representative and therefore denies it. Alerus denies the remaining allegations in Paragraph 74.

75.     Kissler and his representatives were aware of numerous procedural deficiencies related to Alerus's approval of the ESOP Transaction. For example, Kissler knew that the strategy to maximize his own tax savings determined the deadline for closing the transaction by the end of 2015, even though Alerus and its advisors did not start their work until mid- November.

**ANSWER**: Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 75 as to Kissler's or his representatives' knowledge, except to the extent they are alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies. Alerus denies the remaining allegations in Paragraph 75.

76.     Kissler also had been informed by his representative, Ambrose, that GAAP financials would be needed and he knew that GAAP financials had not been provided.

**ANSWER**: Alerus lacks sufficient knowledge and information to form a belief as to the allegations in Paragraph 76, and therefore denies them.

77.     Ambrose reviewed and edited Chartwell's Fairness Opinion, on which Alerus would rely to evaluate the fairness of the proposed transaction to the ESOP. Kissler's representatives also knew of Chartwell's admission that it had prepared its Fairness Opinion without reviewing some of the documents identified in it as "Information Considered" in reaching

its opinion, and that certain financial information was not provided to Chartwell until as late as the evening before the transaction closed.

**ANSWER**: Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 77 as to the knowledge of Kissler's representatives, except to the extent those representatives are alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies.

78.    Finally, Kissler also knew that the ESOP's purchase price was higher than even Ambrose's determination of the value of the ESOP's shares.

**ANSWER**: Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 78 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge of Alerus's alleged ERISA violations, which Alerus denies.

**FIRST CLAIM FOR RELIEF**
**(Against Defendant Alerus for Breaching Fiduciary Duties Of Loyalty, Prudence, And Adherence To Plan Documents)**

79.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 78 inclusive.

**ANSWER**: Alerus restates and incorporates its prior answers as though fully set forth herein.

80.    As a fiduciary to the ESOP, Alerus had a duty to act prudently and solely in the interest of the ESOP and its participants and beneficiaries. These duties required Alerus to, among other things, thoroughly review, analyze, and question any valuation report on which it relied; undertake a good-faith investigation of the merits of the transaction and any red flags that arose; and conduct good-faith negotiations over the ESOP Transaction's price and other material terms. Alerus failed in each of these respects.

**ANSWER:** Paragraph 80 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 80 to the extent they mischaracterize a fiduciary's legal duties.

81.     Alerus rushed its investigation into the ESOP Transaction in order to satisfy an abbreviated timeline dictated by the Sellers' interests.

**ANSWER:** Alerus denies the allegations in Paragraph 81.

82.     Alerus failed to scrutinize and critically question the Chartwell Valuation Report, which raised a number of red flags, including:

    a.  projecting an unreasonably high long-term growth rate that exceeded both Norco's near-term projections and the anticipated GDP growth for the entire U.S. economy;

    b.  using an unreasonable 45% debt-to-capital weighting that was completely unsupported by the sources on which Chartwell purportedly relied;

    c.  failing to account for the projected debt needed to fund capital expenditures financed by new bank debt; and

    d.  applying inappropriate discounts to guideline company multiples that failed to account for meaningful differences between Norco and the guideline companies, such as size and geographic disparities.

**ANSWER:** Alerus denies the allegations in Paragraph 82, including its subparts.

83.     Alerus failed to investigate whether Chartwell had considered the large discrepancy between the 2012 Willamette Valuation and the Chartwell Valuation Report, which implied a level of growth well beyond Norco's actual growth during this time period.

**ANSWER:** Alerus denies the allegations in Paragraph 83.

30

84.    Alerus overlooked multiple procedural irregularities that compromised the reliability and independence of Chartwell's valuation process.

**ANSWER:** Alerus denies the allegations in Paragraph 84.

85.    Alerus did not negotiate in good faith over the purchase price for the ESOP Transaction. Alerus made an opening offer that was more than $5 million above the bottom end of Chartwell's valuation range, allowed Ambrose, the Sellers' representative, to set the parameters of the negotiation and ultimately failed to negotiate a fair transaction price.

**ANSWER:** Alerus denies the allegations in Paragraph 85.

86.    By failing in all of the foregoing respects, Alerus:

a.  caused the ESOP to purchase the Company's stock for significantly more than fair market value;

b.  failed to discharge its duties with respect to the ESOP solely in the interest of the participants and beneficiaries of the ESOP and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of 29 U.S.C. § 1104(a)(1)(A);

c.  failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B); and

d.  failed to act in accordance with the documents and instruments governing the ESOP insofar as such documents and instruments are consistent with ERISA, in violation of 29 U.S.C. § 1104(a)(1)(D).

**ANSWER:** Paragraph 86 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 86, including its subparts.

87.     As a result of the conduct described above, Alerus caused losses to the ESOP for which it is liable pursuant to 29 U.S.C. § 1109(a).

**ANSWER:** Paragraph 87 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 87.

## SECOND CLAIM FOR RELIEF
### (Against Defendant Alerus for Engaging in a Prohibited Transaction)

88.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 87 inclusive.

**ANSWER**: Alerus restates and incorporates its prior answers as though fully set forth herein.

89.     As a fiduciary to the ESOP, Alerus was prohibited from causing or permitting the ESOP to engage in a transaction that constitutes the sale or exchange of property between the ESOP and a "party in interest" to the ESOP, and was prohibited from transferring any assets of the ESOP to a party in interest. 29 U.S.C. § 1106(a)(1)(A), (D).

**ANSWER:** Paragraph 89 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 89 to the extent they mischaracterize Alerus's duties under ERISA.

90.     Kissler was a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(A) as a fiduciary to the ESOP. Kissler was also a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(H) by virtue of his position as CEO and Chairman of Norco's Board of Directors and as the owner of 39.9% of the outstanding Norco shares at the time of the ESOP Transaction.

32

**ANSWER:** Paragraph 90 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 90 to the extent they mischaracterize Kissler's position and status as a shareholder.

91.     By causing the ESOP to purchase the Company's stock from Kissler pursuant to the ESOP Transaction, Alerus:

      a.   caused the ESOP to engage in a transaction that it knew or should have known constituted the sale or exchange, or leasing, of any property between the ESOP and parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(A); and

      b.   caused the ESOP to engage in a transaction that that it knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

**ANSWER:** Paragraph 91 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 91, including its subparts.

92.     As a result of the conduct as described above, Alerus caused losses to the ESOP and is liable to make good to the Plan those losses and to restore to the Plan any profits it made in the ESOP Transaction pursuant to 29 U.S.C. § 1109(a).

**ANSWER:** Paragraph 92 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 92.

**THIRD CLAIM FOR RELIEF**
**(Against Defendant Kissler for Breaching Fiduciary Duties Of Loyalty, Prudence, And Adherence To Plan Documents)**

93.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 92 inclusive.

33

**ANSWER**: These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. To the extent a response is required, Alerus restates and incorporates its prior answers as though fully set forth herein.

94.    As CEO and Chairman of the Company's Board of Directors, Kissler selected and appointed Alerus to serve as Trustee for the ESOP Transaction and had the authority under the Plan Document to remove Alerus. Kissler therefore had a fiduciary duty to monitor Alerus in the performance of its fiduciary duties.

**ANSWER**: These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. To the extent a response is required, Alerus admits that Kissler was the CEO and Chairman of the Company's Board of Directors and that Norco appointed Alerus to Serve as Trustee for the ESOP Transaction and had the authority under the Plan Documents to remove Alerus. The last sentence in Paragraph 94 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in the second sentence in Paragraph 94

95.    Kissler knew or should have known about the circumstances that rendered the ESOP Transaction illegal under ERISA, including that Alerus's investigation of the fair market value of the ESOP's shares was flawed. Kissler should have declined to participate in the illegal transaction and replaced Alerus as Trustee to ensure that the investigation of the fair market value of the ESOP's shares and Alerus's representation of the ESOP's interests had satisfied ERISA's requirements. As a result, Kissler failed to fulfill his duty to monitor Alerus, the Plan's Trustee, and to take appropriate action to protect the participants and beneficiaries in violation of ERISA sections 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 95 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies. Further, Paragraph 95 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 95.

96.    As a result of the conduct described above, Kissler caused losses to the ESOP for which he is liable pursuant to 29 U.S.C. § 1109(a).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Further, Paragraph 96 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 96.

### FOURTH CLAIM FOR RELIEF
### (Against Defendant Kissler for Co-Fiduciary Liability for Alerus' Breaches)

97.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 96 inclusive.

**ANSWER**: These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. To the extent a response is required, Alerus restates and incorporates its prior answers as though fully set forth herein.

98.    In addition to his liability alleged in the Third Claim for Relief, Kissler is liable as a co-fiduciary for Alerus's breaches under 29 U.S.C. § 1105, which makes a fiduciary "liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . (1) if he participates knowingly in . . . an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the

35

administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or 3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. §§ 1105(a)(1), (2), and (3).

**ANSWER**: These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Further, Paragraph 98 purports to paraphrase, quote, and/or cite to a provision of ERISA, which speaks for itself. Alerus respond further that Paragraph 98 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies any allegations to the extent they are inconsistent with the statutory text and denies the remaining allegations in Paragraph 98.

99.     As set forth above, Kissler knew that Alerus rushed its investigation into the ESOP Transaction; failed to scrutinize and critically question Chartwell's valuation report, investigate the large discrepancy between the 2012 Willamette Valuation and the Chartwell Valuation Report, address multiple procedural irregularities that compromised the reliability and independence of Chartwell's valuation process, and negotiate in good faith over the purchase price for the ESOP Transaction; and caused the ESOP to purchase the Company's stock for significantly more than fair market value. Yet, he did not take any action to prevent or remedy the ESOP Transaction. As a result, Kissler "participate[d] knowingly" in Alerus's breach of its fiduciary duties to the ESOP, and is jointly and severally liable for Alerus's breaches pursuant to 29 U.S.C. § 1105(a)(1).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 99 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge of Alerus's purported ERISA violations, which Alerus

denies. Further, Paragraph 99 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 99.

100.   By failing in his duty to monitor Alerus in violation of 29 U.S.C. § 1104(a)(1), Kissler enabled Alerus to engage in a prohibited transaction and breach its fiduciary duties to the ESOP, and is jointly and severally liable for Alerus's breaches pursuant to 29 U.S.C. § 1105(a)(2).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Further, Paragraph 100 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 100.

101.   Despite knowing that Alerus breached its fiduciary duties to the ESOP as set forth above, Kissler failed to make reasonable efforts to remedy the breaches, and is jointly and severally liable for Alerus' breaches pursuant to 29 U.S.C. § 1105(a)(3).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 101 as to Kissler's knowledge, except to the extent Kissler is alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies. Further, Paragraph 101 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 101.

### FIFTH CLAIM FOR RELIEF
### (Against Defendant Kissler for Knowing Participation in Alerus's Breaches)

102.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 101 inclusive.

**ANSWER**: These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. To the extent a response is required, Alerus restates and incorporates its prior answers as though fully set forth herein.

103.    In the alternative to the fiduciary liability alleged in the Third and Fourth Claims for Relief, even if Kissler did not act in a fiduciary capacity, Kissler is liable for knowingly participating in Alerus's fiduciary breaches.

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 103.

104.    Kissler knew or should have known about the circumstances that rendered the ESOP Transaction illegal under ERISA. Specifically, Kissler knew that Alerus rushed its investigation into the ESOP Transaction; failed to scrutinize or critically question the Chartwell Valuation Report, investigate the large discrepancies between the 2012 Willamette Valuation and the Chartwell Valuation Report, address multiple procedural irregularities that compromised the reliability and independence of Chartwell's valuation process, and negotiate in good faith over the purchase price for the ESOP Transaction; and caused the ESOP to purchase the Company's stock for significantly more than fair market value. Yet, he did not take any action to prevent or remedy the ESOP Transaction. Kissler should have declined to participate in the illegal transaction and should have replaced the Trustee to ensure that the investigation of Norco's fair market value and the Trustee's representation of the ESOP's interests had satisfied ERISA's requirements.

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Alerus lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 104 as to Kissler's knowledge, except to

the extent Kissler is alleged to have knowledge of Alerus's purported ERISA violations, which Alerus denies. Further, Paragraph 104 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 104.

105.   Therefore, Kissler knowingly participated in Alerus's violation of 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D) and 29 U.S.C. §§ 1106(a)(1)(A) and (D).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Further, Paragraph 105 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 105.

106.   Kissler benefitted from the ESOP's purchase of the Company stock in the ESOP Transaction and is liable to disgorge or otherwise restore to the Plan the excessive amount under 29 U.S.C. § 1132(a)(5).

**ANSWER:** These allegations relate to claims against defendants other than Alerus that have been dismissed, and therefore no response is required. Further, Paragraph 106 states legal conclusions to which no response is required. To the extent a response is required, Alerus denies the allegations in Paragraph 106.

### PRAYER FOR RELIEF

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1.   Requiring Alerus to restore all losses caused to the ESOP as a result of Alerus's fiduciary breaches, plus interest.

2.   Requiring Kissler to restore all losses caused to the ESOP as a result of his fiduciary breaches, plus interest.

3.     Requiring Kissler to restore all losses caused to the ESOP as a result of Alerus's fiduciary breaches, plus interest.

4.     Imposing a constructive trust or equitable lien on the proceeds Kissler received from the ESOP Transaction.

5.     Requiring Kissler to account for, disgorge, and restore to the ESOP all proceeds and unjust profits realized from the ESOP Transaction, plus interest.

6.     Granting such other relief as may be equitable, just and proper.

**ANSWER**: Alerus denies that Plaintiff is entitled to any of the relief requested in the "Prayer for Relief" section of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Alerus hereby repeats, realleges, and incorporates herein by reference their responses to Paragraphs 1 through 106 of the Answer and plead their Affirmative and Other Defenses without assuming the burden of proof when the law places that burden upon Plaintiff, and reserving the right to amend or add additional affirmative defenses upon further investigation and discovery, as follows:

## FIRST DEFENSE

The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, because Alerus's actions, to the extent any of them are found to be fiduciary actions, complied with the requirements of ERISA as well as industry norms and standards.

40

## THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, because Alerus did not cause the Plan to pay more than adequate consideration or fair market value for the Norco, Inc. stock at issue.

## FOURTH DEFENSE

The claims in the Complaint are barred to the extent they are based upon settlor or corporate actions that are not governed by ERISA, or actions not taken in a fiduciary capacity.

## FIFTH DEFENSE

The prohibited transaction claims asserted in the Complaint are barred because there were no prohibited transactions and/or the transactions were covered by an exemption; including, but not limited to, ERISA sections 408(b)(2), 408(b)(3), 408(b)(12), 408(b)(17), and 408(e).

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's lack of standing to assert such claims.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by ERISA's statute of limitations or other applicable statutes of limitations or repose or by the doctrine of laches.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the Court lacks subject matter jurisdiction over such claims.

## NINTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because neither the ESOP, Plaintiff nor the putative class suffered any legally cognizable losses or damages caused.

## TENTH DEFENSE

41

Plaintiff's claims are or may be barred, in whole or in part, because any injury or loss sustained by Plaintiff was not directly or proximately caused by any alleged acts or omissions by Alerus or persons or entities over which Alerus has or had responsibility or control.

## ELEVENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, to the extent Plaintiff caused, contributed to, and/or failed to mitigate any losses or damages.

## TWELFTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because there were no prohibited transactions and/or the transactions were covered by an exemption.  Specifically, Plaintiff's prohibited transaction claims fails in whole or in part because the prohibited transaction rules in ERISA section 406 do not apply to the ESOP's acquisition of Norco's stock because the ESOP paid no more than adequate consideration for Norco's stock. The transaction therefore satisfies the exemptions set forth in ERISA section 408(e).

ERISA section 408(e), provides that the prohibitions in ERISA section 406(a) shall not apply to "the acquisition or sale by a plan of qualifying employer securities . . . if such acquisition, sale, or lease is for adequate consideration . . . (2) if no commission is charged with respect thereto, and (3) if—(A) the plan is an eligible individual account plan," which includes employee stock ownership plans.  29 U.S.C. § 1108(e).  ERISA section 3 defines adequate consideration as "the fair market value of the asset as determined in good faith by a trustee or named fiduciary."  *Id.* § 1002(18)(B); *see also* Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17632-01 (May 17, 1988) (to be codified at 29 C.F.R. pt. 2510).

To aid a prudent investigation, trustees often "secur[e] an independent assessment from a financial advisor or legal counsel." *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (noting

hiring of financial advisors and legal advisors "is evidence of a thorough investigation"). For example, trustees retain an independent valuation expert to opine on the fair market value of the company's stock and legal counsel to advise it on negotiating the legal terms of the transaction. *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 614 (2d Cir. 2006) ("[G]eneral requirements of an ESOP transaction" include hiring "a financial appraiser, and a trustee to represent the ESOP."); *Keach v. US. Trust Co.*, 419 F.3d 626, 636-37 (7th Cir. 2005) ("[S]ecuring an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation[.]"). Though fiduciaries "need not become experts in the valuation of closely-held stock" because "they are entitled to rely on the expertise of others," *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983), a fiduciary must "investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Keach*, 419 F.3d at 637 (internal quotation marks omitted).

The ESOP received adequate consideration and fair market value for Norco's stock, which Alerus determined in good faith following a prudent investigation prior to approving the transaction. Specifically, Alerus was engaged by Norco to serve as independent transaction trustee on behalf of the ESOP "for the purpose of reviewing, analyzing, and making a determination as to whether the ESOP should approve, consent to, and/or otherwise engage in" the transaction. Ex. 1 at 1. In performing its services as independent ESOP trustee, "Alerus [] act[ed] independently to perform all actions and execute all documents necessary or required to negotiate transaction terms and conditions that are in the 'best interests of Plan participants' and consistent with the requirements of the Plan document and applicable law." *Id.*

43

To assist Alerus in its investigation, Alerus engaged its own set of highly qualified financial and legal advisors. In particular, Alerus engaged Chartwell Financial Advisory, Inc. ("Chartwell") to provide financial advisory services and McDermott Will & Emery LLP (together with Chartwell and Alerus, the "Trustee Team") to act as its legal counsel. Ex. 2 at 1 ("Chartwell shall serve as qualified independent appraiser . . . to the Trustee and shall provide the Trustee with financial advisory services related to a proposed transaction . . . ."); Ex. 3 at 1 ("Thank you for selecting McDermott Will & Emery LLP to represent Alerus Financial, N. A. . . . as Trustee of the trust . . . to be established and maintained pursuant to and in conjunction with the Norco, Inc. . . . . ESOP.").

During the due diligence process, the Trustee Team had unfettered access to comprehensive information on Norco's business operations and financial condition and the company and its industry's prospects.  The Trustee Team also met with and discussed the transaction with Norco's management and internally among the Trustee Team.

Before Alerus agreed to enter into the transaction on behalf of the ESOP, Alerus received a fairness opinion letter from Chartwell opining that "the consideration to be paid by the Trust for the ESOP Shares purchased by the Trust pursuant to the terms of the proposed Transaction is not greater than the fair market value (as such term is used in section 3(18)(B) of the Employee Retirement Income Security Act of 1974, as amended) of such shares" Ex. 4 at 5. In addition, Chartwell prepared its own valuation of Norco's common stock, relying on the following standard of value: "In accordance with Title I of the Employee Retirement Income Security Act of 1974 ('ERISA'), as amended, including but not limited to the U.S. Department of Labor ('DOL') Proposed Regulation Section 2510.3-18(b)(2)(i), for purposes of this engagement we define the term *fair market value* as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under

any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset." Ex. 5 at 1. Ultimately, Chartwell concluded that, as of December 31, 2015, the fair market value of the Norco stock acquired by the ESOP ranged from $125,950,000 to $146,950,000. *Id*. at 52.

Chartwell also delivered to Alerus a report comparing the valuation and diligence steps taken in the Norco ESOP transaction with the fiduciary process guidelines endorsed by the Department of Labor in its agreement with GreatBanc. Ex. 6 at 3. The report documents how Alerus, assisted by its advisors, addressed management projections, potential conflicts of interest, valuation methodologies and discounts, reliance on reviewed financials, and risk factors, with the stated purpose of ensuring the transaction was conducted in line with Department of Labor-endorsed fiduciary standards. The report concluded that Alerus's process for the Norco ESOP transaction aligned favorably with those standards.

## **RESERVATION OF DEFENSES**

Alerus expressly and specifically reserve the right to amend this Answer to add, delete, and/or modify defenses based upon legal theories, facts, and circumstances that may or will be divulged through discovery and/or further legal analysis of Plaintiff's position in this litigation.

Dated: October 21, 2025      Respectfully Submitted,


        By */s/ Cory M. Carone*
        Cory M. Carone, Bar No. 11422
        **STOEL RIVES LLP**
        101 S. Capitol Boulevard, Suite 1900
        Boise, ID 83702
        Telephone: (208) 387-4210
        Facsimile: (208) 389-9040
        Cory.carone@stoel.com

        Lars C. Golumbic (*pro hac vice*)
        Ross P. McSweeney (*pro hac vice*)
        **GROOM LAW GROUP, CHARTERED**
        1701 Pennsylvania Avenue, N.W., Suite 1200
        Washington, DC 20006
        Telephone: (202) 861-6615
        Facsimile: (202) 659-4503
        lgolumbic@groom.com
        rmcsweeney@groom.com

        *Attorneys for Defendant*
        *Alerus Financial, N.A.*